COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-352-CR

DEWAYNE LEE WELLS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted Appellant Dewayne Lee Wells of injury to a child, and, after finding the deadly weapon and the enhancement allegations true, assessed his punishment at sixty years’ confinement in the Institutional Division of the Texas Department of Criminal Justice.  The trial court sentenced him accordingly.  In six points on appeal, Appellant argues that the trial court committed reversible error by admitting his pretrial statement, by allowing the State to comment on his pretrial silence, and by allowing the prosecutor to show the jury notes that the prosecutor had taken during testimony and challenged the sufficiency of the evidence to support the deadly weapon finding.  Because we hold that there is no reversible error and that the evidence is sufficient to support the deadly weapon finding, we affirm the trial court’s judgment.

Background Facts

On May 28, 2004, the Fort Worth Fire Department and Medstar Ambulance responded to an “unconscious baby” call made by Regina Wells, Appellant’s wife.  When the firefighters arrived at the Wellses’ home, they found the Wellses’ nineteen-month-old son, Joseph, unconscious, with bruising around his neck.  Regina had not been at home when the injury occurred.  Appellant and Regina told the firefighters that Joseph’s injuries were caused when their older child fell on him.  The paramedics took Joseph to Cook Children’s Hospital with Regina.  Appellant took their older child and drove to his mother’s apartment in Euless.

Joseph was pronounced brain dead after he arrived at the hospital.  The doctor who treated Joseph testified at trial that Joseph’s death was caused by blunt force trauma to the head and estimated that several hours had passed between the trauma and the brain death.

A Fort Worth police officer, Detective Steve Benjamin, obtained an arrest warrant for Appellant and located Appellant at his mother’s home.  The detective was accompanied by Euless police officers.  When Appellant answered the door, the detective identified himself and told Appellant, “I’d like to talk to you.”  Appellant stated, “I don’t want to talk to you,” and attempted to close the door.  Detective Benjamin prevented the door from closing and took Appellant into custody.  A Euless police officer transported Appellant to Fort Worth, where he was transferred to the car of a Fort Worth police officer. Detective Benjamin testified that while Appellant was in the Fort Worth police car, he asked why he was being arrested, and Detective Benjamin told Appellant that he was being arrested for injury to a child because of Joseph’s injuries.  Appellant stated that he “didn’t hurt Joseph.  S[.W.] jumped on him.”  On voir dire, Detective Benjamin testified that he told Appellant, “I’m not going to take that.  That’s nonsense.  If you want to talk to me about what really happened, I’ll be glad to sit down and talk with you; otherwise, you’re going to jail.”  Appellant stated that he would talk to the detective and tell the detective what happened.

Appellant was then taken to the detective’s office at Alliance for Children.  The detective read Appellant his 
Miranda
(footnote: 2) rights and questioned Appellant for several hours.  Appellant refused to provide a written statement, but he did sign the statement that Detective Benjamin typed for him, which provides that he found his son S.W. jumping in Joseph’s crib.  The statement further provides that Appellant carried Joseph into the living room, where Appellant’s legs started to shake, and he fell down, but he did not remember if he fell on Joseph.  Contrary to Appellant’s statement, Regina testified at trial that Appellant had told her that Joseph had been “fussy,” that Appellant had been unable to quiet him down, and that Appellant had shaken Joseph and thrown him on the floor.

Appellant’s Statements

In his first two points, Appellant contends that trial court erred by admitting his custodial statements because they were taken after Appellant had invoked his right to remain silent and because they were involuntary due to law enforcement’s promises and threats.

Miranda v. Arizona
 requires that a person in custody be informed of his rights, know his rights, and voluntarily waive his rights before a confession is admissible.
(footnote: 3)  Warnings are ineffective and the confession is inadmissible at trial when the officer waits until mid-interrogation to give the warnings.
(footnote: 4)  When a defendant invokes his right to remain silent, interrogation must cease.
(footnote: 5)  Interrogation “refers . . . to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.”
(footnote: 6)  When a defendant invokes his right to remain silent, “any statement taken after[ward] . . . cannot be other than the product of compulsion, subtle or otherwise.  Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.”
(footnote: 7)  Use of an involuntary confession violates due process.
(footnote: 8)
 Appellant unequivocally told Detective Benjamin that he did not want to talk to him at his mother’s Euless apartment.  Unknown to Appellant at that time, Benjamin had a warrant for Appellant’s arrest.  The police took Appellant into custody.  After being transported in a Euless police car and then being transferred to a Fort Worth police car, Appellant asked why he was being arrested.  In reply, Benjamin told him the charges.  Appellant then denied that he had injured Joseph and claimed that his older son had done it.  Benjamin responded, “I’m not going to take that.  That’s nonsense.  If you want to talk to me about what really happened, I’ll be glad to sit down and talk with you; otherwise, you’re going to jail.”  Appellant later signed a statement typed by the police.  Both Appellant’s oral statement made in the car and the written statement were admitted at trial.

The trial court held that the oral statement Appellant made in the police car was freely and voluntarily given and not in response to custodial interrogation.  We agree.  The officer’s action of informing Appellant of the charges against him when asked was part of the officer’s routine, administrative duty.
(footnote: 9)  The officer’s response to Appellant’s question was not designed to elicit a response from Appellant; therefore, it was not the functional equivalent of custodial interrogation.
(footnote: 10)  Because Appellant’s oral statement in the car was volunteered, we hold that the trial court properly denied Appellant’s motion to suppress that statement.

Regarding the written statement, the trial court held that it complied with article 38.22 of the Texas Code of Criminal Procedure,
(footnote: 11) that the warnings were given, and that the statement was admissible.  Appellant argues that he did not voluntarily reinitiate the conversation and thereby waive his right to remain silent.  Rather, he argues that he acquiesced to the alternatives Benjamin offered: either talk about the offense and relate “what really happened” or go to jail.  Appellant argues that the obvious implication of Benjamin’s words was that if Appellant talked and told the police what they wanted to hear, perhaps he would be released.  The subsequent interrogation lasted several hours. The State argues that Appellant’s only voluntariness complaint before the trial court was that Appellant did not reinitiate a conversation with Detective Benjamin after telling him that he did not want to talk to him.  The State contends that Appellant has not preserved for appellate review the federal due process violation and the coercion complaints found in Appellant’s brief.  The State is incorrect.  Appellant addressed the issues of promises, the alternatives of giving a statement or going to jail, and federal and state constitutional due process provisions in the trial court.  It is true that the only cases he specifically addressed were 
Miranda 
and 
Edwards v. Arizona,
(footnote: 12) 
but the record is clear that the trial court understood Appellant’s complaints and that they are the same complaints he raises on appeal.

When determining whether a statement should have been excluded as a matter of federal constitutional law, we decide whether the confession was voluntary or coerced.
(footnote: 13)  Our review examines the totality of the circumstances, not whether the defendant would have refused to confess but for the promise.
(footnote: 14) The ultimate question is whether the defendant’s will was overborne.
(footnote: 15)  A promise can render a confession invalid under article 38.21 of the Texas Code of Criminal Procedure if it is “positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully.”
(footnote: 16)
 Although the officer offered Appellant alternatives, giving a statement or going to jail, he did so in response to Appellant’s volunteered statement that he did not injure Joseph.  The alternatives were artfully phrased, but they did not include release.  Rather, Appellant’s alternatives were to go to the police station and give a statement or to go directly to jail.  Never did the officer suggest that Appellant would be released.  All the officer actually offered Appellant was a detour on his way to jail.  We do not construe the officer’s statement as a threat—Appellant had already been arrested and was being transported to jail when the statement was made.
(footnote: 17)  The officer’s offer did not rise to such a level that it would coerce Appellant into giving a statement or overcome his desire to keep silent.

After Appellant arrived at the police station, he was properly warned in connection with his written statement.  No threats or promises were made at the police station in connection with Appellant’s written statement.

Considering all the circumstances surrounding the written statement, we hold that the trial court did not err by holding that the written statement was made after Appellant was appropriately warned, that the written statement was voluntary and in compliance with Article 38.22, and, implicitly, that Appellant voluntarily waived his right to remain silent.  Consequently, we hold that the trial court did not err by admitting Appellant’s written statement.  We overrule Appellant’s first two points.

Pretrial Silence

In his third and fourth points, Appellant contends that the trial court erred by overruling his objections to the comments on Appellant’s pretrial silence when the detective testified that he talked to Appellant from outside the apartment and again when the detective testified, “I can say what he said . . . ,” both referring to Appellant’s conduct at the time of arrest.

When the detective arrived at Appellant’s home, Appellant tried to prevent his entering and told him that he did not want to talk with him.  At trial, there was an extended hearing outside the presence of the jury regarding the admissibility of Appellant’s statements to the detective at the time of the entry and arrest.  The trial judge stated unequivocally that the statements were not admissible.  The detective was present and participated in the hearing.  As Appellant pointed out, there was no way the detective could have misunderstood the trial court’s ruling.  Yet, when the jury returned, the following occurred:

Q.  Did you attempt to make entrance into that apartment?

A.  I placed my foot in the door, but I did not walk –

[Defense Counsel]:  Objection to the officer volunteering information, Your Honor, — 

THE COURT:  Sustained.

[Defense Counsel]:  — instead of answering questions.

Q.  When you tried to go in the apartment, what happened?

A.  I can say what he said or —

Appellant objected immediately and specifically that the detective  attempted to subvert the trial court’s ruling by making clear to the jury that Appellant had said something that had been suppressed.  But there was no comment on Appellant’s pretrial silence because the detective only informed the jury that Appellant made some kind of statement that the jury was not allowed to hear.  Although we as the reviewing court know that his statement was an invocation of his right to remain silent, it is not clear that the jury understood that Appellant’s statement was an invocation of that right.

Comments on pretrial silence violate Appellant’s right to remain silent, which is protected both by the Fifth Amendment to the United States Constitution and by  Article I, Section 10 of the Texas Constitution.
(footnote: 18)  In discussing a comment on a defendant’s failure to testify, which also includes the invocation of the right to remain silent after warnings, the Texas Court of Criminal Appeals explained,

Article 38.08 prohibits any comment on the right of an accused person to remain silent or his failure to testify.  In order to constitute a violation of Article 38.08, the language must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant’s failure to testify.  The challenged comment must be viewed from the standpoint of the jury and the language must be more than an implied or indirect allusion to the defendant’s silence.
(footnote: 19)
 Similarly, a comment on Appellant’s pretrial silence must be manifestly intended, or of such a character,  that the jury would naturally and necessarily take it to be a comment on the defendant’s invocation of his right to remain silent before trial.
(footnote: 20)  The detective’s statement was not one that the jury would naturally and necessarily take as a comment on Appellant’s invocation of his right to pretrial silence.  We therefore hold that the trial court did not err by admitting the testimony and overrule Appellant’s third and fourth points.

The Prosecutor’s Notes

In his fifth point, Appellant contends that the trial court abused its discretion by allowing the prosecutor to act as a second court reporter and present his notes to the jury during trial.  Appellant argues that there is only one official transcription of trial testimony, and that is the transcription provided by the official court reporter.  In the case now before this court, the prosecutor made his own notes and provided them to the jury by means of projection onto a screen.  The notes were not admitted into evidence.  The State argues that Appellant failed to lodge a timely objection because, “[a]lthough it is difficult to determine from the record, it appears as though portions of the projected notes could have been used with [the first two witnesses].”  Appellant objected after two witnesses had testified.  A defendant must object as soon as the ground for objection becomes apparent.
(footnote: 21)  Because, as the State points out, it is unclear from the record when the ground for the objection first became apparent, and because Appellant represents without contradiction that he objected as soon as he realized what the State was doing, we hold that the objection was timely.

As to the merits of the complaint, the State argued at trial and on appeal that a lawyer may write on a poster points from a witness’s testimony that the lawyer wants to emphasize.  Projecting notes on a screen is simply a technologically advanced version of the same practice.  We agree.  The trial court has discretion to allow visual aids and charts that summarize the admitted evidence for the jury.
(footnote: 22)  Because such summaries of a witness’s testimony are permitted, we overrule Appellant’s fifth point.

Deadly Weapon Finding

In his sixth point, Appellant contends that the evidence is insufficient to support a finding of a deadly weapon.  Within his discussion, he also argues that there is no evidence to support the finding.  We will therefore address both legal and factual sufficiency of the evidence.  A deadly weapon is anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.
(footnote: 23)
 The complainant, Joseph, was a nineteen-month-old child who had braces for his legs and could neither walk nor crawl.  Appellant admitted to his wife that he had gotten frustrated while caring for Joseph.  Appellant shook Joseph and threw him on the floor, and as a result, Joseph was limp but breathing.  When Regina Wells returned home, she found the door locked with a deadbolt and, inside the apartment, Joseph, lying in his crib.  Joseph was having trouble breathing, and his half-open eyes were glazed.  When Joseph arrived at the hospital, he appeared brain dead to the treating physician.  Dr. Marshall found that Joseph had severe brain swelling and an impact bruise on his forehead.  Bruises on both sides of Joseph’s neck looked like fingerprints or pressure marks from a hand.  Dr. Marshall estimated that several hours had passed between the injury to Joseph’s head and the brain death.

Dr. Marshall testified that he was sure that Joseph had endured blunt force trauma to his head.  Dr. Krouse of the Tarrant County Medical Examiner’s Office also concluded that the cause of Joseph’s death was blunt force injury to the head.  Dr. Krouse found that the bruise on Joseph’s forehead bore a distinctive L-shape with a very linear edge on the top.  He opined that that meant that the object that struck Joseph’s head or that Joseph’s head struck could be relatively flat, but somewhere the object would have something with the L-shape on it.  The bruise on the back of Joseph’s head, however, could have been caused by a flat surface.  It was the second major point of impact to the head.  Dr. Krouse could not determine which blow actually caused death.  He agreed with Dr. Marshall that the symptoms he saw were consistent with Joseph’s striking a hard object, which could include a floor.

Dr. Krouse testified that whatever the object was, it was capable of causing serious bodily injury or death.  On cross-examination, Dr. Krouse repeated that the surface causing the injury could have been anything flat, but he could not say what that surface was.

Applying the appropriate standards of review,
(footnote: 24) we hold that the evidence is both legally and factually sufficient to establish that, as alleged in the indictment, the floor or some object unknown to the grand jury was used as a deadly weapon.  We overrule Appellant’s sixth point.

Conclusion

Having overruled Appellant’s six points, we affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  March 29, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).

3:
Id
. at 444-45, 86 S. Ct. at 1612.

4:
Missouri v. Seibert
, 542 U.S. 600, 617, 124 S. Ct. 2601, 2613 (2004).

5:
Miranda
, 384 U.S. at 445, 86 S. Ct. at 1612.

6:
Rhode Island v. Innis
, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-90 (1980) (footnotes omitted).

7:
Miranda
, 384 U.S. at 474, 86 S. Ct. at 1627-28.

8:
Jackson v. Denno
, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964); 
Brown v. Mississippi
, 297 U.S. 278, 281-82, 56 S. Ct. 461, 462-63 (1936).

9:
See Pennsylvania v. Muniz
, 496 U.S. 582, 601-02, 110 S. Ct. 2638,  2650 (1990) (holding that questions reasonably related to the police officer’s administrative concerns do not fall under 
Miranda
).

10:
See id.

11:
Tex. Code Crim. Proc. Ann.
 art. 38.22 (Vernon 2005).

12:
Edwards v. Arizona
, 451 U.S. 477, 101 S. Ct. 1880 (1981).

13:
Arizona v. Fulminante
, 499 U.S. 279, 285-86, 111 S. Ct. 1246, 1251-52 (1991).

14:
Id.

15:
See id.
 at 288, 111 S. Ct. at 1253; 
see also Creager v. State
, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997).

16:
Martinez v. State
, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); 
see also 
Tex. Code Crim. Proc. Ann.
 art. 38.21 (Vernon 2005).

17:
See Powell v. State
, 5 S.W.3d 369, 379 (Tex. App.—Texarkana 1999, pet. ref’d) (construing officer’s statement—“You mind if I search the car . . . , or I can have my dog run around the car—whichever you want”—not “as a threat to coerce [the person] into consenting [to a search] but rather as an option”), 
cert. denied
, 529 U.S. 1116 (2000); 
Ashcraft v. State
, 
900 S.W.2d 817, 824-25 (Tex. App.—Corpus Christi 1995, pets. ref’d and dism’d) (finding officer’s statement to Ashcraft that his mother could be held responsible for stolen property found in her home to be a statement of fact).

18:
U.S. Const
 amend. V; 
Tex. Const.
 art. I, § 10; 
Doyle v. Ohio
, 426 U.S. 610, 617-18, 96 S. Ct. 2240, 2244-45 (1976), 
Samuel v. State
, 688 S.W.2d 492, 496 (Tex. Crim. App. 1985).

19:
Bower v. State
, 769 S.W.2d 887, 906-07 (Tex. Crim. App. 1989) (citations omitted), 
overruled on other grounds by Heitman v. State
, 815 S.W.2d 681 (Tex. Crim. App. 1991).

20:
See id.

21:
Lagrone v. State
, 942 S.W.2d 602, 618 (Tex. Crim. App.
), 
cert. denied
, 522 U.S. 917 (1997).

22:
Baker v. State
, 177 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2005, no pet.); 
Strong v. State
, 805 S.W.2d 478, 485 (Tex. App.—Tyler 1990, pet. ref’d).

23:
Tex. Penal Code Ann.
 § 1.07(a)(17) (Vernon Supp. 2006).

24:
See Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005) (both providing legal sufficiency standard of review); 
Watson v. State
, 204 S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005); 
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); 
Johnson v. State
, 23 S.W.3d 1, 8-9, 11-12 (Tex. Crim. App. 2000); 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997) (all providing factual sufficiency standard of review).